Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN BENSON,<br><br>    Plaintiff,<br><br>    v.<br><br>CELLULAR BIOMEDICINE GROUP, INC., BIZUO (TONY) LIU, TERRY A. BELMONT, WEN TAO (STEVE) LIU, EDWARD SCHAFER, HANSHENG ZHOU, CHUN KWOK ALAN AU, GANG JI, and DARREN O'BRIEN,<br><br>    Defendants. | Case No:<br><br>JURY TRIAL DEMANDED |

Plaintiff Steven Benson ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

**NATURE OF THE ACTION**

1.      This is an action against Cellular Biomedicine Group, Inc. ("Cellular Biomedicine" or the "Company"), and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17

1

C.F.R. § 240.14a-9, in connection with the proposed acquisition (the "Proposed Transaction") of Cellular Biomedicine by CBMG Holdings ("Parent") and CBMG Merger Sub Inc. ("Merger Sub"), a wholly-owned subsidiary of Parent.[1]

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the Company was headquartered in New York City during the sales process leading up to the Proposed Transaction.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff is, and has been at all relevant times hereto, an owner of Cellular Biomedicine's common stock.

---

[1] Parent and Merger Sub were formed on behalf of a consortium consisting of: (i) Bizuo (Tony) Liu (Chief Executive Officer of Cellular Biomedicine) and certain other members of Cellular Biomedicine management (Yihong Yao, Li (Helen) Zhang and Chengxiang (Chase) Dai); (ii) Dangdai International Group Co. ("Dangdai"), Limited, Mission Right Limited, Wealth Map Holdings Limited, Earls Mill Limited, OPEA SRL, Maplebrook Limited, Full Moon Resources Limited, Viktor Pan and Zheng Zhou; and (iii) Yunfeng Fund III, L.P., TF Capital Fund III L.P., and Velvet Investment Pte. Ltd. (collectively, the "Consortium").

7. Defendant Cellular Biomedicine is a clinical stage biopharmaceutical company that develops immunotherapies for cancer and stem cell therapies for degenerative diseases in Greater China. The Company is incorporated in Delaware. The Company's common stock trades on the Nasdaq under the ticker symbol, "CBMG."

8. Defendant Bizuo (Tony) Liu ("T. Liu") is Chief Executive Officer, Chief Financial Officer, and executive director of the Company.

9. Defendant Terry A. Belmont ("Belmont") is Chairman of the Board of the Company.

10. Defendant Wen Tao (Steve) Liu ("W. Liu") is a director of the Company.

11. Defendant Edward Schafer ("Schafer") is a director of the Company.

12. Defendant Hansheng Zhou ("Zhou") is a director of the Company. Defendant Zhou is affiliated with Dangdai, a member of the Consortium.

13. Defendant Chun Kwok Alan Au ("Au") is a director of the Company.

14. Defendant Gang Ji ("Ji") is a director of the Company.

15. Defendant Darren O'Brien ("O'Brien") is a director of the Company. Defendant O'Brien has worked at Sailing Capital Overseas Investments Fund, L.P. ("Sailing Capital") since 2013 and is a Managing Director and Partner at the firm. Sailing Capital is a rollover stockholder in connection with the Proposed Transaction.

16. Defendants T. Liu, Belmont, W. Liu, Schafer, Zhou, Au, Ji, and O'Brien are collectively referred to herein as the "Individual Defendants."

17. Defendants Cellular Biomedicine and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. The Proposed Transaction

18. Cellular Biomedicine develops proprietary cell therapies for the treatment of cancer and degenerative diseases. The Company conducts immuno-oncology and stem cell clinical trials in China using products from its integrated GMP laboratory. The Company's GMP facilities in China, consisting of twelve independent cell production lines, are apparently designed and managed according to both China and U.S. GMP standards. Its Shanghai facility includes a "Joint Laboratory of Cell Therapy" with GE Healthcare and a "Joint Cell Therapy Technology Innovation and Application Center" with Thermo Fisher Scientific. These partnerships focus on improving manufacturing processes for cell therapies.

19. According to Cellular Biomedicine, it currently has ongoing CAR-T Phase I clinical trials in China. The China NMPA (formerly CFDA) approved the Company's IND application for a Phase II trial for AlloJoin®, CBMG's "Off-the-Shelf" allogenic haMPC therapy for the treatment of Knee Osteoarthritis (KOA), and has accepted the Company's IND application for a Phase II trial for ReJoin® autologous haMPC therapy for treatment of KOA. The NMPA has also accepted CBMG's dossier for an IND application for clinical trials of anti-BCMA CAR-T.

20. On August 12, 2020, Cellular Biomedicine issued a press release announcing that it had signed a definitive merger agreement to be acquired by the Consortium. Under the terms of the merger agreement, Cellular Biomedicine stockholders would receive $19.75 in cash for each outstanding share of common stock held immediately prior to the effective time of the merger, other than (i) the shares owned by Parent or its subsidiaries, (ii) the shares held by Cellular Biomedicine as treasury stock, (iii) certain shares held by members of the Consortium, and (iv) the shares in respect of which appraisal rights have been properly and validly exercised under

4

Delaware law. The press release states, in pertinent part:

### Cellular Biomedicine Group (CBMG) Enters Into Definitive Merger Agreement; Transaction Would Result In Company Going Private

NEWS PROVIDED BY
**Cellular Biomedicine Group**
Aug 12, 2020, 06:30 ET

GAITHERSBURG, Md. And SHANGHAI, Aug. 12, 2020 /PRNewswire/ -- Cellular Biomedicine Group, Inc. (Nasdaq: CBMG) ("Company," "CBMG," "we" or "our"), a biopharmaceutical firm engaged in the drug development of immunotherapies for cancer and stem cell therapies for degenerative diseases, announced today that it has signed a definitive merger agreement to be acquired by a newly-formed entity ("Parent") formed on behalf of a consortium consisting of (i) Bizuo (Tony) Liu (CEO of CBMG) and certain other members of CBMG management (Yihong Yao, Li (Helen) Zhang and Chengxiang (Chase) Dai) (collectively, the "Management Rollover Stockholders"), (ii) Dangdai International Group Co., Limited, Mission Right Limited, Wealth Map Holdings Limited, Earls Mill Limited, OPEA SRL, Maplebrook Limited, Full Moon Resources Limited, Viktor Pan and Zheng Zhou (together with the Management Rollover Stockholders, the "Consortium Rollover Stockholders") and (iii) Yunfeng Fund III, L.P., TF Capital Fund III L.P., Velvet Investment Pte. Ltd., and Bizuo (Tony) Liu (the "Equity Investors").

Under the terms of the merger agreement, CBMG's stockholders will receive US$19.75 in cash for each outstanding share of common stock held immediately prior to the effective time of the merger, other than (i) the shares owned by Parent or its subsidiaries, (ii) the shares held by CBMG as treasury stock, (iii) certain shares held by rollover stockholders, including the Consortium Rollover Stockholders (collectively, the "Rollover Stockholders") and (iv) the shares in respect of which appraisal rights have been properly and validly exercised under Delaware law. In connection with the Merger, the shares held by the Rollover Stockholders will be cancelled without payment of any consideration and the Rollover Stockholders will subscribe for newly-issued shares of Parent. The Rollover Stockholders collectively hold approximately 51.5% of the outstanding CBMG shares.

\*       \*       \*

The Company's Board of Directors, acting on the unanimous recommendation of the special committee formed by the Board of Directors (the "Special Committee"), approved the merger agreement and the transactions contemplated by the merger agreement and resolved to recommend that the Company's stockholders adopt the merger agreement and approve the merger. The Special Committee, which is comprised solely of independent and disinterested directors of the Company,

exclusively negotiated the terms of the merger agreement with Parent, with the assistance of its independent financial and legal advisors.

Under the terms of the merger agreement, CBMG (at the direction of the Special Committee) will conduct a 30-day "go shop" process, during which CBMG is permitted to solicit, initiate, facilitate or encourage acquisition proposals and to participate in discussions or negotiations with respect to any acquisition proposal. Following the "go shop" process, CBMG may respond to certain unsolicited acquisition proposals and, during the first 15-day period following the "go shop" process, CBMG may continue to engage with certain third parties that have made acquisition proposals during the "go shop" process, in each case, subject to the terms and conditions of the merger agreement. CBMG will have the right to terminate the definitive agreement to accept a superior proposal, if one is received, subject to the terms and conditions of the merger agreement. There can be no assurance that this "go-shop" process will result in a superior proposal or that any other transaction will be approved or completed. CBMG does not intend to disclose developments with respect to the "go-shop" process unless and until the Special Committee makes a determination requiring further disclosure.

Upon closing of the merger, CBMG will become a wholly owned subsidiary of Parent. CBMG is expected to remain headquartered in Maryland. The merger is subject to approval by CBMG's stockholders, including a non-waivable condition requiring approval by the holders of a majority of the outstanding shares of CBMG common stock that are not beneficially owned by Parent, the Rollover Stockholders, the Equity Investors or their respective affiliates, as well as regulatory and certain other customary closing conditions. The merger is not subject to a financing condition. The Company will call a meeting of stockholders for the purpose of voting on the adoption of the merger agreement in due course. If completed, the merger will result in the Company becoming a privately held company, and CBMG's common stock would no longer be listed on the NASDAQ Capital Market.

Jefferies LLC is serving as sole financial advisor to the Special Committee, and White & Case LLP is serving as legal counsel to the Special Committee. O'Melveny & Myers LLP is serving as U.S. legal counsel to Parent.

**About Cellular Biomedicine Group, Inc.**

Cellular Biomedicine Group, Inc. (Nasdaq: CBMG) develops proprietary cell therapies for the treatment of cancer and degenerative diseases. The company conducts immuno-oncology and stem cell clinical trials in China using products from its integrated GMP laboratory. The Company's GMP facilities in China, consisting of twelve independent cell production lines, are designed and managed according to both China and U.S. GMP standards. Its Shanghai facility includes a "Joint Laboratory of Cell Therapy" with GE Healthcare and a "Joint Cell Therapy Technology Innovation and Application Center" with Thermo Fisher Scientific.

These partnerships focus on improving manufacturing processes for cell therapies. CBMG currently has ongoing CAR-T Phase I clinical trials in China. The China NMPA (formerly CFDA) approved the Company's IND application for a Phase II trial for AlloJoin®, CBMG's "Off-the-Shelf" allogenic haMPC therapy for the treatment of Knee Osteoarthritis (KOA), and has accepted the Company's IND application for a Phase II trial for ReJoin® autologous haMPC therapy for the treatment of KOA. The NMPA has also accepted CBMG's dossier for an IND application for clinical trials of anti-BCMA CAR-T. CBMG is included in the broad-market Russell 3000® Index the small-cap Russell 2000® Index and the Loncar China BioPharma index. To learn more about CBMG, please visit www.cellbiomedgroup.com.

21. On December 8, 2020, Defendants caused to be filed with the SEC a Schedule 14A Preliminary Proxy Statement (the "Proxy Statement") pursuant to Section 14(a) of the Exchange Act in connection with the Proposed Transaction.

### B. The Proxy Statement Contains Materially False and Misleading Statements and Omissions

22. The Proxy Statement, which recommends that Cellular Biomedicine shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning: (i) the Company's financial projections; (ii) the financial analyses performed by the Company's Special Committee's[2] financial advisor, Jefferies LLC ("Jefferies"), in connection with its fairness opinion; and (iii) the sales process leading up to the Proposed Transaction.

23. The omission of the material information (referenced below) renders the following sections of the Proxy Statement false and misleading, among others: (i) Background of the Merger; (ii) Reasons for the Merger; Recommendation of the Special Committee; Recommendation of the Board; Fairness of the Merger; (iii) Opinion of Jefferies LLC; and (iv) Certain Company Forecasts.

24. Unless and until the material misstatements and omissions (referenced below) are

---

[2] The Special Committee refers to Defendants Au, Schafer, Belmont and W. Liu who were delegated power to evaluate and negotiate the terms of the Proposed Transaction and alternatives to the Proposed Transaction.

7

remedied before the anticipated shareholder vote on the Proposed Transaction, Cellular Biomedicine shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

### 1. Material Omissions Concerning the Company's Financial Projections

25. The Proxy Statement omits material information concerning the Company's financial projections.

26. The Proxy Statement provides that:

> [I]n connection with the Special Committee's evaluation of a potential transaction involving the Buyer Consortium, in March 2020, Company management presented to and discussed with the Special Committee certain unaudited prospective financial information prepared by Company management for fiscal years 2020 through 2030 comprising the March Management Forecasts and certain assumptions underlying the March Management Forecasts, including assumptions with respect to the probability of success of certain products under development. The March Management Forecasts also were provided to Jefferies. In July 2020, Company management presented to and discussed with the Special Committee the July Management Forecasts, which reflected certain updates to the March Management Forecasts prepared by Company management with respect to the Company's individual products.

27. The Proxy Statement provides a purported summary of the July Management Forecasts.

28. With respect to the July Management Forecasts, the Proxy Statement fails to disclose the following: (1) all line items underlying (i) Gross Profit, (ii) Operating Income (EBIT), (iii) EBITDA, (iv) NOPBT, and (v) NOPAT; (2) the Company's net income projections; and (3) a reconciliation of all non-GAAP to GAAP financial metrics.

29. The Proxy Statement further fails to disclose the March Management Forecasts, including the "assumptions with respect to the probability of success of certain products under development."

8

30. When a company discloses non-GAAP financial metrics in a Proxy Statement, the company must also disclose all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. The SEC has increased its scrutiny of a company's use of non-GAAP financial measures as such measures can be misleading and "crowd out" more reliable GAAP information.[3]

31. The disclosure of this information is material because it would provide the Company's shareholders with a basis to project the future financial performance of the Company and would allow shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Defendant(s) and the Company's financial advisor, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisor's fairness opinion in determining whether to vote for or against the Proposed Transaction.

32. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

---

[3] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (footnotes omitted) (last visited Dec. 25, 2020) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

### 2. Material Omissions Concerning Jefferies' Analyses

33. In connection with the Proposed Transaction, the Proxy Statement omits material information concerning analyses performed by Jefferies.

34. The Proxy Statement fails to disclose the following concerning Jefferies' "*Discounted Cash Flow Analysis*": (1) the terminal values of the Company; (2) the individual inputs and assumptions underlying the (i) range of perpetuity growth rates of 2.5% to 3.5%, and (ii) discount rate range of 12.5% to 14.5%; (3) the Company's net cash as of June 30, 2020; and (4) the number of fully diluted shares of the Company's common stock as of August 10, 2020.

35. With respect to Jefferies' "*Premiums Paid Analysis*," the Proxy Statement fails to disclose each transaction and the individual premiums paid therein.

36. The valuation methods, underlying assumptions, and key inputs used by Jefferies in rendering its purported fairness opinion must be fairly disclosed to Cellular Biomedicine shareholders. The description of Jefferies' fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses. Without the information described above, Cellular Biomedicine shareholders are unable to fully understand Jefferies' fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 3. Material Omissions Concerning the Sales Process Leading up to the Proposed Transaction

37. The Proxy Statement omits material information concerning the sales process leading up to the Proposed Transaction.

38. The Proxy Statement provides that, on November 9, 2019, "Liu, Yao and Dai,

Ms. Zhang, HBH[4] and TF Capital[5] entered into the consortium agreement (the "Consortium Agreement") pursuant to which each party agreed, among other things, to form a consortium the members of which would work exclusively with one another to undertake a transaction to acquire all of the outstanding shares of Common Stock not already owned by such parties in a 'going private transaction[.]'" The Proxy Statement, however, fails to disclose the terms of the Consortium Agreement, including "the per share merger consideration to be offered in connection with a non-binding proposal to acquire all outstanding shares of Common Stock not already owned by such parties."

39. The Proxy Statement provides that, during the sales process, Defendant T. Liu had discussions with HBH, TF Capital, Dangdai, and Mission Right Limited ("Mission"). The Proxy Statement, however, fails to disclose the nature of Defendant T. Liu's discussions with: (1) HBH on September 12, 2019 "regarding the Company's clinical program and liquidity and cash flow positions"; (2) HBH during late September 2019 and early October 2019 "to discuss the possibility of a potential transaction involving the Company and HBH"; (3) HBH and TF Capital during October 2019 regarding a "potential transaction"; (4) HBH following the October 12, 2019 Board meeting concerning "the idea of pursuing a 'going private transaction'"; (5) HBH and TF Capital between November 2 and November 9, 2019 "to explore structures for a potential 'going private transaction'"; (6) Dangdai during the aforementioned period concerning "a potential 'going private transaction' involving the Company"; and (7) Mission on November 5, 2019 concerning "the possibility of 'a going private transaction[.]'"

---

[4] HBH refers to "Hillhouse Bio Holdings, L.P."

[5] TF Capital refers to "TF Capital Ranok Ltd., TF Capital Fund III L.P., Winsor Capital Limited and TF I Ltd."

11

40. The Proxy Statement provides that, "[f]ollowing public announcement of the November 11 Proposal,[6] . . . certain stockholders of the Company, consisting of Viktor Pan, Zheng Zhou, Wealth Map Holdings Limited ("Wealth Map"), Earls Mill Limited ("Earls Mill"), OPEA SRL, Maplebrook Limited ("Maplebrook") and Full Moon Resources Limited ("Full Moon"), each communicated with [Defendant T.] Liu to inquire about the proposed transaction." The Proxy Statement, however, fails to disclose the nature and content of these communications, and why Defendant T. Liu was permitted to have such communications as opposed to the Special Committee who had the sole authority for such discussions.

41. The Proxy Statement provides that, on November 12, 2019, Defendant T. Liu "contacted representatives of Novartis to discuss the November 11 Proposal and to provide additional information regarding the members of the Buyer Consortium." Again, the Proxy Statement fails to disclose the reasons Defendant T. Liu, in light of his potential conflict of interest, was permitted to discuss the November 11 Proposal with Novartis without the apparent consent or involvement of the Special Committee.

42. The Proxy Statement fails to adequately disclose the nature of the responses of "the remaining parties" to Jefferies' "additional outreach" between March 3, 2020 and August 11, 2020, as well as the nature of the parties' responses during the go-shop period.

43. The Proxy Statement fails to disclose the reasons Defendant Ji, who is purportedly an independent director of the Company, was not appointed to the Special Committee, including whether he has any potential or actual conflicts of interest in connection with the Proposed

---

[6] The "November 11 Proposal" refers to the November 11, 2019 proposal "the Buyer Consortium delivered to the Company [of a] non-binding indication of interest [to] acquir[e] all outstanding shares of Common Stock (other than those shares held by members of the Buyer Consortium that may be rolled over in the proposed transaction) for $19.50 per share in cash[.]"

Transaction.

44.     The Proxy Statement provides that, on March 25, 2020, the Special Committee submitted a counterproposal of $22.00 per share in cash to the Consortium's then offer of $19.50 per share in cash. Only ten (10) days later, on April 4, 2020, in response to the Consortium's new offer of $18.00 per share in cash, the Special Committee lowered its counterproposal to $19.50 per share in cash, purportedly due to the "COVID-19 pandemic['s] . . . impact on the Company's operations[.]" This is the justification provided by the Company despite the fact that the COVID-19 pandemic was declared a pandemic on March 11, 2020 by the World Health Organization—well before both of the Special Committee's counterproposals. The Proxy Statement therefore fails and must disclose the rationale and specific basis for the Special Committee's lowering of its counterproposal to the Consortium, without any apparent consideration or review by the Special Committee of any updated financial projections or analyses to reflect the purported impact of the pandemic on the Company's operations.

45.     The Proxy Statement fails to disclose the nature and content of the Special Committee's discussions on June 11, 2020 concerning "recent clinical results relating to one of the Company's products and the potential impact of such results on the Company."

46.     The Proxy Statement fails to disclose the nature and content of Defendant T. Liu's discussion of "the Company's projected cash flows for the remainder of calendar year 2020" during the July 14, 2020 Board meeting.

47.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

## COUNT I
### For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder
### Against All Defendants

48.     Plaintiff repeats and realleges each and every allegation contained above as if fully

set forth herein.

49. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

50. Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Proxy Statement.

51. The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

52. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

53. Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

54. Plaintiff repeats and realleges each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

55. The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

56. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

57. In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Proxy Statement at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Proxy Statement.

58. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

59. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

60. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

    D.    Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    E.    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 25, 2020

Respectfully submitted,

**HALPER SADEH LLP**

By: /s/ Daniel Sadeh
Daniel Sadeh, Esq.
Zachary Halper, Esq. (to be admitted *pro hac vice*)
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com
        zhalper@halpersadeh.com

*Counsel for Plaintiff*